IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

JEFFREY D. MARTIN

CRIMINAL ACTION

NO. 19-712

PAPPERT, J.                                                      October 17, 2022

## MEMORANDUM

Jeffrey Martin was charged in a superseding indictment on November 19, 2020 with conspiracy and multiple counts of securities and wire fraud arising from his alleged participation in a series of "pump-and-dump" schemes.  The Securities and Exchange Commission previously filed against Martin a civil securities fraud complaint relating to one of the alleged schemes.  At the conclusion of Martin's detention hearing in Los Angeles, the Magistrate Judge, against the recommendation of Pretrial Services, denied the Government's motion to detain Martin, instead ordering him released on a partially secured bond with numerous conditions.

On August 1, the Government moved, pursuant to 18 U.S.C. § 3145(a)(1), for an order staying and revoking the Magistrate Judge's Order.  Judge Tucker stayed the release order on August 3, 2022.[1]  The Court held a hearing on the Government's motion on September 28 (ECF 30) and now grants it because no conditions of release can reasonably assure Martin's appearance for trial.

---

[1]        The case was transferred from Judge Tucker to this Court shortly thereafter.  (ECF 17.)

I

On December 12, 2019, a grand jury in the Eastern District of Pennsylvania

returned a sealed indictment charging Martin with one count of conspiracy to commit

securities fraud, one count of securities fraud and aiding and abetting.  (ECF 1).  On

November 19, 2020, the grand jury returned a superseding indictment charging Martin

with twelve counts of securities fraud and related offenses.  (Superseding Indictment;

ECF 5.)[2]

The charges stem from Martin's alleged participation in a series of "pump-and-

dump" market manipulation schemes.  (*Id*.)  Specifically, Martin allegedly sought to

artificially inflate the share price of certain penny stocks and sell his shares at a

substantial profit, to the detriment of the investing public.[3]  (Gov. Mot. Revocation p. 3;

ECF 14.)  The Government alleges Martin carried out his scheme by securing effective

control of the companies and their stock, creating and releasing false and misleading

company information to the public and engaging in manipulative trading of the shares.

*See* (*Id*.)

Upon the superseding indictment's return, Magistrate Judge Rice issued a bench

warrant for Martin.  Martin was living in China at the time and remained there as a

fugitive until July 19, 2022, when Thai authorities intercepted him attempting to enter

Bangkok.  (*Id*. at 4.)  Martin's ties to China, with which the United States does not have

---

[2]       Martin is charged with one count of conspiracy to commit securities fraud (18 U.S.C. § 1349);
one count of conspiracy (18 U.S.C. § 371);  three counts of securities fraud under Title 18 (18 U.S.C. §
1348); two counts of securities fraud under Title 15 and the C.F.R. (15 U.S.C. §§ 78j(b), 78ff and 17
C.F.R. 240.10b-5);  and five counts of wire fraud (18 U.S.C. § 1343).

[3]       The companies allegedly involved are Mainstream Entertainment, Inc.; Resort Savers, Inc.;
Axion Corp.; Virtual Medical International, Inc.; and Union Bridge Holdings Ltd.

an extradition treaty, are significant.  He owns an apartment there with his wife, a

Chinese national; obtained residence documents allowing him to maintain China as his

permanent home; and has access to a Chinese bank account with $3,000,000–

$4,000,000 in his wife's name.[4]  (*Id.* at 13–14).  For the five years prior to his capture in

Thailand, Martin lived exclusively in China.  (*Id.*)  He does not own any property in the

United States.  (Sept. 27, 2022 Pretrial Serv. Mem. p. 12.)

## II

A defendant must be detained pending trial under the Bail Reform Act if, after a

hearing, a court finds that no conditions or combination of conditions can "reasonably

assure the appearance of the person as required and the safety of another person and

the community."  18 U.S.C. § 3142(e).  Upon the Government's motion to revoke a

magistrate judge's release order under § 3145(a)(1), the court of original jurisdiction

reviews the matter *de novo*.  *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir.

1985).  The Government must prove its claim by a preponderance of the evidence.

*United States v. Epstein*, 155 F. Supp. 2d 323, 325 (E.D. Pa. 2001) (quoting *United

States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996)).

When determining whether there are conditions of release that will reasonably

assure the person's appearance, courts must consider factors including the nature and

circumstances of the offense charged, the weight of the evidence against the person and

the person's character and history, which includes financial resources and geographical

ties.  *See* 18 U.S.C. § 3142(g)(1)–(4); *Id.*

---

[4]      The parties dispute whether the funds were reported in US dollars or Hong Kong dollars.
*See, e.g.,* (Sept. 28, 2022 Hr'g Tr. 43:19-25; 44:1).  $3,000,000–$4,000,000 Hong Kong dollars converts
to approximately $380,000–$500,000 USD.  (Sept. 27, 2022 Pretrial Serv. Mem. p. 5.)

III

A

The Government argues that if Martin is not in custody, he is likely to flee to China, where he will be out of reach of the United States justice system. Martin proposes he be released on a number of conditions, including execution of a $200,000 bond by his ex-wife Sharron Martin and her domestic partner Benjamin Sorenson, secured by a lien against Sorenson's Idaho home; home confinement at Mr. Sorenson's home under Ms. Martin's third-person custody; GPS Monitoring with Pretrial Services' approval required to leave the residence; and a separate $50,000 bond secured by his daughter, Kristin Martin. *See* (Def.'s Prop. Order; ECF 29).

B

At the hearing the government presented evidence of Martin's ties to China, his significant financial assets and evasion of the SEC civil enforcement action. Jeffery Cook, Senior SEC Enforcement Counsel and lead investigator in Martin's civil enforcement action, detailed Martin's conduct in connection with one of the pump-and-dump schemes ultimately charged here.[5]

Cook testified that Martin did not participate fully in the investigation and repeatedly sought to avoid service once it was concluded. Martin was deposed by the SEC twice in 2015 and learned of the contemplated action against him through an August 2016 Wells notice, providing the agency's intention to bring charges. *See* (Pl.'s Ex. 1 ¶¶ 1–2; Hr'g Tr. at 13:1–4). Martin, however, through counsel, declined to make a Wells submission, which is an opportunity to explain why charges shouldn't be brought.

---

[5]     The civil proceeding is ongoing but has been stayed pending the resolution of this criminal case. (Sept. 28, 2022 Hr'g Tr. 23:13–16.)

(Pl.'s Ex. 1 ¶ 3; Hr'g Tr. at 13:5–9).  The SEC then served one of Martin's companies with the civil complaint on August 4, 2017.  (Hr'g Tr. 16:1–7.)  Martin, according to the Government, fled to China six days later.  (Gov't Mot. Revocation p. 2).

Service against Martin thus proved more difficult.  The attorney who represented him throughout the SEC investigation was by then out of the picture, so the SEC tried to serve Martin through another of his lawyers, who refused because he "hadn't been retained in connection with the SEC litigation" and therefore "was not authorized" to do so.  (Hr'g Tr. 16:24–25; 17:1–2; Pl.'s Ex. 1 ¶ 6.)  Service was similarly unsuccessful at three of Martin's associated addresses in Orlando; individuals present at each location reported that Martin was not there and "resided overseas."  (Pl.'s Ex. 1 ¶ 6.)

The SEC attempted to serve Martin at his home in Hong Kong, going so far as to hire local counsel to surveil his address "for several weeks."  (Pl.'s Ex. 1 ¶ 9.)  They were again unsuccessful.  (Hr'g Tr. 19:9-19.)  The District Court of Florida then granted leave to serve Martin by alternative means: email, Facebook and LinkedIn.  (Hr'g Tr. 20:19–23; 22:1–2).  Martin, who was copied on the SEC's motion for alternate service, deleted his Facebook and LinkedIn pages the day after it was filed.  (*Id*. at 21:10-21; Pl.'s Ex. 1 ¶¶ 11-12.)  Service was ultimately effected via email on May 8, 2019, after which Martin unsuccessfully moved to dismiss for insufficient service of process.  (Hr'g Tr. at 22:1–13; 22:23–25; 24:1–3.)

Sharron Martin, Martin's ex-wife and surety guarantor for the $200,000 bail, confirmed her agreement to the surety arrangement and responsibility for Martin's compliance with the conditions of his release.  (Hr'g Tr. 34:1–11.)  Ms. Martin testified

that she and her partner, Benjamin Sorenson, agreed to use the deed of Sorenson's home as collateral. (*Id.*) She also discussed her and Mr. Martin's family in the United States, including their three children, eight grandchildren and his stepdaughter who all live here. *See* (*Id.* at 29:3–12; 29:17–21; 35:1–9).

On cross examination, however, Ms. Martin admitted that for the eighteen years she was married to the defendant, she knew only that he "had a lot of different companies" and "bought and sold shells." (*Id.* at 36:11–20.) She did not know what Martin did with the shell companies or whether he was "pumping and dumping stocks." (*Id.*) Nor did she know the extent of her daughter Kristin's involvement with her ex-husband's businesses or that her son, Justin, was the Vice President of Mainstream Entertainment, one of the companies part of the alleged pump-and-dump scheme. (*Id.* at 37:14–25; 38:1–13). As established at the hearing, Kristin passed information along to Martin while he was in China and Justin was named as person number eight in Martin's indictment due to his role at Mainstream Entertainment. (*Id.* at 54:3–9; 61:2–3.)

IV

With respect to the first factor considered to determine if the release conditions will reasonably assure Martin's appearance at trial, his alleged crimes involve neither violence nor drugs. *See* 18 U.S.C. § 3142 (g)(1). Under factor three, although Martin has been living in China, his ties to the United States, particularly his children and grandchildren, carry some weight. *See id.* at (g)(3). Under the final factor, the Government acknowledged there is no concern Martin, if released, would pose a danger to any person or the community. *See id.* at (g)(4); (Hr'g Tr. at 39:25; 40:1–12).

Sharron Martin credibly conveyed an intention to monitor her ex-husband's behavior, an understanding of her obligations to report him and a willingness to do so if needed. But her partner Mr. Sorenson is a "long-haul trucker" who is by the nature of his job away from the home for long stretches at a time. (Hr'g Tr. at 30:5–6.) And Sharron herself "work[s] hard," impeding her ability to supervise Martin to the degree necessary. (*Id.*) Nor can the Court take much comfort in her ability to effectively monitor Martin when she's not working. She never really knew or understood what Martin did to make money during their lengthy marriage and didn't know the role her own children, one of whom is a proposed guarantor and the other a purported reason for Martin not wanting to skip the country, played in her ex's businesses, if not the alleged pump-and-dump schemes themselves.

Martin argues that the surety obligations guaranteed by Sharron and Kristin Martin disincentivize him to flee because it would financially harm people he cares about. But Martin, as the Government correctly points out, had no qualms about putting his children in "harm's way" when he fled to China the first time. (*Id.* at 44:6–9). Moreover, Martin's financial resources could allow him to compensate family members for any losses incurred.

The remaining factors heavily favor detention. Under factor two, the Government has represented that the evidence against Martin is substantial. The grand jury indictment indicates a finding of probable cause that he committed the alleged crimes, multiple co-conspirators will purportedly testify against him and there are evidently plenty of text messages, e-mails and other documents which will corroborate the witness testimony and/or implicate Martin on their own. To top it off,

Martin faces a statutory maximum penalty of 245 years and, more practically, an advisory sentencing guideline range of 168–210 months in prison to go along with up to $12.5 million in fines.

Under the third factor, Martin's ties with China are substantial.  He has his only home there; he owns no property in the United States.  His wife is a Chinese national and the couple lived in China for the five years preceding his capture–during which time Martin never came to the United States to see any of his children or other family (or ex-family) members.

Martin has substantial financial resources.  Although the exact value of his assets is unclear, Martin's share of profits from the pump-and-dump scheme is alleged to exceed $10,000,000 USD.  *See* (Hr'g Tr. 43:19–21.)  Martin admitted to Pretrial Services in Los Angeles that he has significant funds in a Chinese bank account in his wife's name.  *See* (Sept. 27, 2022 Pretrial Serv. Mem. p. 14).  Whether it's $3–$4 million in US dollars, as Martin initially said, or in Hong Kong dollars as he now claims, either amount is more than enough to facilitate his flight from the United States.  Martin also owns a business in China, Cayman Capital Partners Limited, which pays him a monthly income of roughly $7,500 USD.  (*Id*. at 13.)  His wife's company, Nyjj Hong Kong Limited, has $750,000 in business assets and pays her a monthly income of $8,000.[6]  (*Id*. at 14.)

The kicker is obviously the lack of an extradition treaty with China.  As credibly presented by Mr. Cook, Martin's evasion of the SEC enforcement action raises serious concerns about the likelihood he will stick around for his criminal trial, where the

---

[6]    The pretrial services memorandum does not specify whether these sums are in US or Hong Kong dollars. Either way, the couple has more than enough money to operate.

stakes are dramatically higher.  Martin's failure to visit his family while in China for

five years and his willingness to involve certain family members in a scheme that

exposed them to potential civil and criminal liability lead the court to give little weight

to his ties to the United States and his supposed reluctance to hurt his guarantors and

family members, financially or otherwise.

Martin's argument that the combination of home supervision, GPS tracking and

forfeiture of his travel documents is adequate to prevent flight is undercut by his

financial resources, established life in a safe haven, history of evading government

enforcement and the considerable risk of substantial incarceration.  While at present

Martin does not possess travel documents, where there's a will there's a way,

particularly when you have enough money.  Martin has too much to lose and the

Government has sufficiently shown that if released, he will likely be gone for good.

The Court has carefully considered the California Magistrate Judge's decision

and respectfully disagrees with his weighing of the facts.  Because the Government has

proven by a preponderance of the evidence that there are no conditions or combination

of conditions of release that will reasonably assure Martin's appearance, his pretrial

detention is warranted.

An appropriate Order follows.

BY THE COURT:


*/s/ Gerald J. Pappert*

GERALD J. PAPPERT, J.

9